# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PINCHAS RAUL,<br><br>        Plaintiff,<br><br>v.<br><br><br>SIERRA ONCOLOGY, INC., ROBERT PELZER, GAURAV AGGARWAL, ANDREW ALLEN, MONA ASHIYA, CRAIG COLLARD, JEFFREY H. COOPER, STEPHEN G. DILLY, GEORGIA ERBEZ, CHRISTY OLIGER, and ANDREW SINCLAIR,<br><br>        Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Pinchas Raul ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Sierra Oncology, Inc. ("Sierra Oncology" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Sierra Oncology and the Defendants.

## SUMMARY OF THE ACTION

1.  This is an action brought by Plaintiff against Sierra Oncology and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed transaction (the "Proposed Transaction") between the Company and GlaxoSmithKline plc ("GSK").

2.  On April 12, 2022, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GSK and Orikum Acquisition Inc. ("Acquisition Sub"), an indirect, wholly owned subsidiary of GSK. Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into Sierra Oncology, with Sierra Oncology surviving the merger as a wholly owned subsidiary of GSK. As a consequence of the merger, the Company's shareholders will receive $55.00 in cash for each share of Sierra Oncology common stock they own (the "Merger Consideration").

3.  On May 16, 2022, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Sierra Oncology and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Sierra Oncology shareholders before the vote on the Proposed Transaction or, in the event the

Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8. Plaintiff is, and has been at all times relevant hereto, the owner of Sierra Oncology shares.

9. Defendant Sierra Oncology is incorporated under the laws of Delaware and has its principal executive offices located at 1820 Gateway Drive, Suite 110, San Mateo, California 94404. The Company's common stock trades on the NASDAQ under the symbol "SRRA."

10. Defendant Robert Pelzer ("Pelzer") is and has been a Sierra Oncology director at all times during the relevant time period.

3

11. Defendant Gaurav Aggarwal ("Aggarwal") is and has been a Sierra Oncology director at all times during the relevant time period.

12. Defendant Andrew Allen ("Allen") is and has been a Sierra Oncology director at all times during the relevant time period.

13. Defendant Mona Ashiya ("Ashiya") is and has been a Sierra Oncology director at all times during the relevant time period.

14. Defendant Craig Collard ("Collard") is and has been a Sierra Oncology director at all times during the relevant time period.

15. Defendant Jeffrey H. Cooper ("Cooper") is and has been a Sierra Oncology director at all times during the relevant time period.

16. Defendant Stephen G. Dilly ("Dilly") is and has been the President, Chief Executive Officer ("CEO") and a director of Sierra Oncology at all times during the relevant time period.

17. Defendant Georgia Erbez ("Erbez") is and has been a Sierra Oncology director at all times during the relevant period.

18. Defendant Christy Oliger ("Oliger") is and has been a Sierra Oncology director at all times during the relevant time period.

19. Defendant Andrew Sinclair ("Sinclair") is and has been a Sierra Oncology director at all times during the relevant time period.

20. Defendants Pelzer, Aggarwal, Allen, Ashiya, Collard, Cooper, Dilly, Erbez, Oliger, and Sinclair are collectively referred to herein as the "Individual Defendants."

21. The Individual Defendants, along with Defendant Sierra Oncology, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

22. Sierra Oncology, a late-stage biopharmaceutical company, engages in researching, developing, and commercializing therapies for the treatment of patients with hematology and oncology needs. Its lead drug candidate, momelotinib, is a selective and orally bioavailable Janus kinase 1 (JAK 1), JAK2, and Activin A receptor type 1 (ACVR1) inhibitor. The company also develops SRA515, a selective bromodomain-containing protein 4 inhibitor; and SRA737, an orally bioavailable small molecule inhibitor of Checkpoint kinase 1. It has the license agreements with Carna Biosciences, Inc. to develop and commercialize SRA141, a small molecule kinase inhibitor targeting Cdc7; AstraZeneca AB; and CRT Pioneer Fund LP. The company was formerly known as ProNAi Therapeutics, Inc. and changed its name to Sierra Oncology, Inc. in January 2017.

### The Company Announces the Proposed Transaction

23. On April 13, 2022, the Company jointly issued a press release announcing the Proposed Transaction. The press release stated in part:

> LONDON--(BUSINESS WIRE)-- GlaxoSmithKline plc (LSE/NYSE: GSK) and Sierra Oncology, Inc (Nasdaq: SRRA) today announced that the companies have entered into an agreement under which GSK will acquire Sierra Oncology, a California-based, late-stage biopharmaceutical company focused on targeted therapies for the treatment of rare forms of cancer, for $55 per share of common stock in cash representing an approximate total equity value of $1.9 billion (£1.5 billion).
>
> Myelofibrosis is a fatal cancer of the bone marrow impacting the normal production of blood cells. Anaemia represents a high unmet medical need in patients with myelofibrosis. At diagnosis, approximately 40% of patients are already anaemic, and it is estimated that nearly all patients will eventually develop anaemia.[1,2] Patients treated with the most commonly used JAK inhibitor will often require transfusions, and more than 30% will discontinue treatment due to anaemia.[3] Anaemia and transfusion dependence are strongly correlated with poor prognosis and decreased overall survival.[4]

Momelotinib has a differentiated mode of action with inhibitory activity along key signalling pathways. This activity may lead to beneficial treatment effects on anaemia and reduce the need for transfusions while also treating symptoms. In January 2022, Sierra Oncology announced positive topline results from the MOMENTUM phase III trial. The study met all its primary and key secondary endpoints, demonstrating that momelotinib achieved a statistically significant and clinically meaningful benefit on symptoms, splenic response, and anaemia.

**Luke Miels, Chief Commercial Officer, GSK** said: "Sierra Oncology complements our commercial and medical expertise in haematology. Momelotinib offers a differentiated treatment option that could address the significant unmet medical needs of myelofibrosis patients with anaemia, the major reason patients discontinue treatment. With this proposed acquisition, we have the opportunity to potentially bring meaningful new benefits to patients and further strengthen our portfolio of specialty medicines."

**Stephen Dilly, MBBS, PhD, President and Chief Executive Officer, Sierra Oncology** said: "Uniting with GSK creates the best opportunity for Sierra Oncology to realise its mission of delivering targeted therapies that treat rare forms of cancer while also delivering compelling and certain value for our stockholders. Now we have a partner with a global infrastructure and oncology expertise that enables us to deliver momelotinib to patients as quickly as possible and on a global scale."

Momelotinib complements GSK's *Blenrep* (belantamab mafodotin), building on GSK's commercial and medical expertise in haematology. The proposed acquisition aligns with GSK's strategy of building a strong portfolio of new specialty medicines and vaccines. If the transaction is completed and momelotinib is approved by regulatory authorities, GSK expects momelotinib will contribute to GSK's growing specialty medicines business, with sales expected to begin in 2023, with significant growth potential and a positive benefit to the Group's adjusted operating margin in the medium term.

**Financial considerations**

Under the terms of the agreement, the acquisition will be effected through a one-step merger in which the shares of Sierra Oncology outstanding will be cancelled and converted into the right to receive $55 per share in cash. Subject to customary conditions, including the approval of the merger by at least a majority of the issued and outstanding shares of Sierra Oncology, and the expiration or earlier termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the transaction is expected to close in the third quarter of 2022 or before.

The per share price represents a premium of approximately 39 per cent to Sierra Oncology's closing stock price on 12 April 2022 and a premium of approximately

63 per cent to Sierra's volume-weighted average price (VWAP) over the last 30 trading days. Sierra Oncology's Board of Directors has unanimously recommended that Sierra's stockholders vote in favour of the approval of the merger. Additionally, stockholders of Sierra Oncology holding approximately 28 per cent of Sierra's outstanding shares, have agreed to vote their shares in favour of approval of the merger.

GSK will account for the transaction as a business combination and expects it to be accretive to adjusted EPS in 2024, the expected first full year of momelotinib's sales. New GSK reaffirms its full-year 2022 guidance, the medium-term outlook for 2021-2026 of more than 5% sales and 10% adjusted operating profit CAGR* at CER**, and long-term sales ambition.

The value of the gross assets of Sierra Oncology to be acquired (as of 31 December 2021) is $109 million (£83 million at the rate of £1 = $1.312, being the 31 March 2022 spot rate). The net losses of the business were $95 million for the 12 months ended 31 December 2021 (£70 million, at the rate of £1 = $1.38, being the average rate for the period).

* CAGR: Compound Annual Growth Rate; **CER: Constant Exchange Rate

**Advisors**

PJT Partners is acting as financial advisor and Cleary Gottlieb Steen & Hamilton LLP is serving as legal counsel to GSK in connection with the transaction. Lazard is acting as financial advisor and Wilson Sonsini Goodrich & Rosati is serving as legal counsel to Sierra Oncology.

## FALSE AND MISLEADING STATEMENTS

## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

24. On May 16, 2022, the Company authorized the filing of the Proxy Statement with the SEC. The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

25. Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's

7

shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material Misrepresentations or Omissions Regarding the Company's Financial Projections

26. The Proxy Statement contains projections prepared by the Company's management concerning the Proposed Transaction, but fails to provide material information concerning such.

27. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

28. In order to make management's projections included in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

29. Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction. Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

**Material False and Misleading Statements or Material
Misrepresentations or Omissions Regarding Lazard's Financial Opinion**

30. The Proxy Statement contains the financial analyses and opinion of Lazard Frères & Co. LLC ("Lazard") concerning the Proposed Transaction, but fails to provide material information concerning such.

31. With respect to Lazard's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying Lazard's use of discount rates ranging from 10.0% to 12.0%; (ii) the Company's weighted average cost of capital; (iii) the Company's range of terminal values; (iv) the estimated probability-adjusted, after-tax unlevered free cash flows to be generated by Sierra Oncology from March 31, 2022 through the end of terminal year of 2040; and (v) the inputs and assumptions underlying Lazard's use of a negative terminal growth rate range of (50%) – (30%).

32. With respect to Lazard's *Selected Public Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for each of the companies observed in the analysis.

33. With respect to Lazard's *Selected Precedent Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for each of the transactions observed in the analysis.

9

34. With respect to Lazard's *Premia Paid Analysis*, the Proxy Statement fails to disclose: (i) each transaction observed by Lazard in the analysis; (ii) the premiums paid.

35. With respect to Lazard's *Research Analyst Price Targets* analysis, the Proxy Statement fails to disclose: (i) the individual price targets observed; and (ii) the sources thereof.

36. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

37. Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions. Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

## COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

38. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

40. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

41. Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

42. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

43. The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above

in connection with their decision to approve and recommend the Proposed Transaction.

44. The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

45. The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

46. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

47. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act)**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of Sierra Oncology within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sierra Oncology, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

52.     In addition, as set forth in the Proxy Statement at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the

Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

55. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C. Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 31, 2022                                              Respectfully submitted,

By: */s/ Joshua M. Lifshitz*
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
**LIFSHITZ LAW PLLC**
1190 Broadway,
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*